REDACTED DOCUMENT PER COURT ORDER OF NOVEMBER
11, 2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK - - - - - - - - x

| | | |
|---|---|---|
| MEF I, LP, | : | 19 Civ. 8019 (PGG) |
| Plaintiff, | : | DECLARATION OF SCOTT W. ABSHER IN OPPOSITION TO |
| - against - | : | PLAINTIFF'S MOTION TO RESTRAIN USE OF ASSETS |
| SHIFTPIXY, INC., | : | AND FOR APPOINTMENT OF PLAINTIFF AS RECEIVER |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SCOTT W. ABSHER submits the following declaration, under penalty of perjury pursuant to 28 U.S.C. § 1746:

***Introduction.***

1.    I am a founder and the president and chief executive officer of ShiftPixy, Inc. ("ShiftPixy"), defendant in the above-captioned action.  I submit this declaration in opposition to the motion of MEF I, LP ("MEFI"), plaintiff in the action and an investor in ShiftPixy, seeking equitable relief which it characterizes as:  (a) a preliminary injunction to restrain ShiftPixy "from using, selling, transferring or disposing of any of" its assets;" and (b) an order "appointing plaintiff as receiver . . . [with] the right to take possession of [those assets], including but not limited to any and all revenue, income, dividend, interest, check, draft, note, trade acceptance or other instrument evidencing an obligation to pay any such sum to [ShiftPixy]."  (Dkt. ## 19, 24.)

2.    For the reasons that follow and for the reasons set forth in ShiftPixy's memorandum of law submitted with this declaration, this motion should be denied.  I first discuss ShiftPixy's business and evolution in this declaration, and then discuss ShiftPixy's current financial condition as it bears on MEFI's motion.  So that the Court has ready access to

the key relevant documents, I am filing with this declaration, as attachments, the following

documents:  Attachment 1: the ShiftPixy June 2018 Note executed by Alpha Capital Anstalt (all

senior notes in this series are identical across noteholders, and the terms of the December 2018

note are identical to those of the June 2018 Note); Attachment 2: the security agreement between

ShiftPixy and MEFI; and Attachment 3; a form of the Securities Purchase Agreement between

ShiftPixy and each noteholder.

***ShiftPixy – The Company's Business and History.***

        3.     ShiftPixy is a specialized staffing and human capital management service

provider.  It supplies human resources, employment compliance, insurance and payroll

administration, and operational employment services solutions for its client-employers, and shift

work or "gig" opportunities for employees, offering effective and workable responses to

demands for sizeable contingent part-time workforces.  ShiftPixy defines a "client" as a business

that pays it to provide such employee-related services.  ShiftPixy defines workers supplied to

such businesses as "worksite employees" (or "WSEs").  Although ShiftPixy is currently focused

on clients in the restaurant and hospitality industries, traditionally market segments with high

employee turnover and low pay rates, it also offers such services to clients in other industries.  I

and several colleagues founded ShiftPixy in 2015.  It was privately held until 2017, when it made

an initial public offering of its common shares.  It has been a '34 Act reporting company since

then, and is in compliance with SEC reporting requirements.  Its shares are traded on the

NASDAQ stock market.

        4.     ShiftPixy's initial market focus was to provide payroll services for small

businesses hiring lower income and part-time workers in an environment in which shift workers

work part-time/temporary positions, now commonly called "gigs."  Similarly, its initial business

goal was to bring employment administration and traditional staffing services to an underserved segment of the market – small businesses that lack human resources and payroll/insurance infrastructure and therefore struggle with HR compliance requirements and the high turnover that is prevalent for many businesses who employ lower income and part time workers. Since inception, ShiftPixy has built a client employee pool populated by lower wage employees, averaging approximately $22,000 per year in compensation and for personnel typically under 35 years of age.

5.     Along with staffing demands, ShiftPixy original business model entailed providing payroll services and facilitating lower cost workers' compensation insurance in exchange for an administration fee calculated as a percentage of gross payroll. Human resources staffing and employment administration services are historically highly labor intensive to onboard and have high customer acquisition and maintenance costs. Early in its history, ShiftPixy evaluated these costs and determined that proper process flows, automated with blockchain and cloud technology and coupled with access to lower cost workers' compensation policies made possible by economies of scale, could facilitate a profitable and low-cost scalable business model.

6.     Of course, ShiftPixy's business model has adapted to changing market conditions and to its own accretion of knowledge of requirements of its market segment. In that connection, virtually since its inception ShiftPixy invested significant amounts of capital in development of a robust human resources information system ("HRIS") platform in order to reduce worksite employee management costs, to automate worksite employee onboarding, and to provide additional value-added services for clients to result in additional revenue streams to ShiftPixy. Beginning in 2017, ShiftPixy also began to develop an HRIS database and front-end

"thin client" desktop and mobile phone application to facilitate lower-cost and more efficient worksite employee and client onboarding as well as additional client functionality and opportunities for worksite employees to locate shift work.

7.    In March 2019, ShiftPixy brought the development of this application in-house to complete and launch the initial phase.  As of August 31, 2019, the initial launch was completed, and the "thin client" application was online.  (A "thin client" is a device like a smart phone or even a "client" that doesn't process information – rather it reads and interacts with the user.)  ShiftPixy is currently working on implementing additional mobile application and HRIS functionality in delivery, intermediation services, and scheduling.  These services are now functional and were being initially deployed in August 2019 to selected current customers.  ShiftPixy expects to make a full launch of these services in the fourth calendar quarter of 2019.

8.    ShiftPixy's HRIS platform captures, holds, and processes human resources and payroll information for clients and WSEs through an easy to use customized "thin client" front-end interface coupled with a secure, hosted database.  The HRIS system can be accessed by either a desktop computer or electronic mobile phone application.  Development of this platform has significantly reduced the time, expense, and error rate for onboarding our clients' worksite employees into ShiftPixy's HRIS system and has thereby created a technological solution for employers and workers.  Once onboarded, the client employees are included as worksite employees available for shift work within ShiftPixy's business ecosystem.  This allows the HRIS platform to serve as a "gig" marketplace for WSEs and clients and allows clients to manage their staffing needs more efficiently and more effectively.

9.    ███████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████████████

█████████████████████████████████

***ShiftPixy's Financial Condition and Operating Results.***

        10.    I am advised that a factual basis that courts sometimes consider in connection with the type of extreme relief MEFI is seeking is whether the party opposing financial constraints and appointment of a receiver is a solvent entity.  I am further advised that this inquiry is sometimes taken in connection with the applicant's effort to establish that its harm will be irreparable, so as to justify the issuance of equitable relief by a court.  Of course, as I understand it, this Court has already found, in the related Alpha and Dominion cases, that plaintiffs there, situated identically to MEFI here, failed to demonstrate that ShiftPixy was insolvent so as to warrant the injunctive relief they sought in those cases.  In the Dominion case, the later-filed of the two, the Court had before it and analyzed ShiftPixy's May 31, 2019 financial statements (or ShiftPixy's summary thereof) in rejecting Dominion's contentions concerning solvency.  If anything, ShiftPixy's current financial condition shows continuing improvement over that last quarterly reporting period.  ShiftPixy is neither insolvent nor on the verge of insolvency.  As in both the Alpha and Dominion cases, any effort here to portray ShiftPixy as insolvent will fail.  I will summarize key metrics from ShiftPixy's fiscal year-end, August 31, 2019, financial statements.[1]

---

[1] Because ShiftPixy's fiscal year-end is August 31, ShiftPixy must file its annual report on SEC Form 10-K on or before November 30, 2019, in accordance with SEC regulations.  It expects to do so timely.  But the metrics I discuss here have not yet been publicly released.  They are drawn from ShiftPixy's current

*(Continued on next page)*

11. 

disclosed until the final annual report is filed with the SEC. For that reason, we asked the Court for leave to file our papers in opposition to this motion under seal until such time as the final report is filed. I understand that the Court directed us to redact our papers instead, to eliminate sensitive material, and we have complied with that direction. Relatedly, while the audit of these financial statements is not yet wholly complete, I believe the results of operations discussed here are accurate.

14.     A significant portion of ShiftPixy's cash receipts is used to fund workers compensation cash reserves which are currently funded under our workers compensation plan at approximately 125% of expected workers compensation claims.  These reserves are included as a cash use in our operating cash flow as well as a portion of the increase of our assets increase.  As of August 31, 2019, based on existing workers compensation claims and insurance actuary-based loss projections, we ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

15.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

16.     Furthermore, MEFI has benefited significantly from its investment in ShiftPixy.  Its original cash investment was $2,250,000.  It received $2,500,000 of principal at the June 2018 issuance and a further $222,222 of principal for the December 2018 settlement for a total of $2,722,222 of note principal.  MEFI also received warrants to purchase 251,004 shares of ShiftPixy common stock as well on the June 2018 issuance date with exercise prices subject to automatic price reset provisions which remain outstanding.  As of today, MEFI holds $701,389 in principal (not including accrued interest or redemption/default amounts consisting of:  (a) the

December 2018 principal balance of $222,222 and (b) the remaining June 2018 balance of $479,389. This does not include any accrued interest or redemption/default amounts. MEFI has been paid: (a) $275,000 in cash representing $208,333 of principal repayment and $66,667 of interest, (b) interest paid in stock of $133,333 (subject to adjustment, *see* below) and (c) principal conversions of $1,812,500 (also subject to adjustment, *see* below). *See* discussion below at paragraph 40.

17.     Without adjustment, the total cash and stock MEFI received from ShiftPixy is $2,220,833, or $29,167 less than its original investment with $701,389 of note principal and 251,004 warrants remaining outstanding. All of the shares issued were issued at a 15% discount to market. Incorporating this discount provides an additional $343,382 of value. Adjusted for the value of the conversions for this discount, the total value and interest returned to MEFI to date is $2,564,215, with an additional $701,389 remaining outstanding, or $3,265,604, equaling 145% of its original investment, without attributing any value to the 251,004 warrants.

18.     I have two observations. First, the metrics set forth above concerning ShiftPixy's financial condition and results are not the metrics of a failing business. In fact, they show just the opposite – a thriving business well on its way to reaching profitability. ShiftPixy's business and prospects are sound and encouraging. ShiftPixy is neither insolvent nor on the verge of insolvency. Second, MEFI's "crying poor" to this Court is groundless. In the last analysis, its claim would appear to be that it did not make *enough* on its investment. And it still holds some $700,000 in principal which ShiftPixy has every intention of repaying.

***The Senior Secured "Toxic" Notes.***

19.     In June 2018, and in March 2019, ShiftPixy sold an aggregate of $10 million of senior secured convertible notes to five investors. MEFI is one of the investors,

having purchased, for the sum of $2,250,000 as set forth above, a note (the "June 2018 Note") in the principal amount of $2,500,000, bearing 8% interest and carrying rights to convert indebtedness to common stock of ShiftPixy.  This action concerns the June 2018 Note as well as a further note, given to secure a technical default under the June 2018 Note and dated December 20, 2018, in the principal amount of $222,222.22 (the "December 2018 Note).  The terms of the December 2018 Note are identical in all substantive respects to the terms of the June 2018 Note. (The June 2018 Note and the December 2018 Note are identical in terms; the June 2018 Note is filed as Attachment 1 to this declaration.  The notes are sometimes referred to in this declaration individually as a "Note" and together as the "Notes.")[2]

20.     Under both Notes, the holders had the right under certain circumstances to demand conversion of indebtedness into equity at a material discount to market price.  The conversion feature granted the noteholders virtually unfettered power to force ShiftPixy to issue common shares to them.  While conversion extinguishes some of ShiftPixy's indebtedness to the noteholders, it also floods the market with newly-issued shares, increases the stock float, and of course creates extreme selling pressure in the market;  this inevitably drives down the market price of ShiftPixy's stock in a continuing spiral.  I have heard financial instruments such as this

---

[2] The other investors holding the Notes are Alpha Capital Anstalt; CVI Investments, Inc.; Dominion Capital LLC; and Osher Capital Partners, LLC.  Cases brought by Alpha and Dominion (respectively the "Alpha Action," 19-cv-6199 (PGG), and the "Dominion Action," 19-cv-6704 (PGG)) are related cases to the present case.  (Neither CVI nor Osher has sued.)  The Alpha Action concerned only the March 2019 Note.  The Dominion Action concerns both the June 2018 Note and the March 2019 Note (and the December 2018 Note).  In both related cases, this Court denied plaintiffs' separate motions for preliminary injunctions on various grounds, among them the failure to establish that ShiftPixy's refusal to honor common stock conversion demands under the notes would cause the noteholder to suffer irreparable harm and the failure to establish that ShiftPixy was an insolvent entity whose parlous financial condition would stand as a proxy for irreparable harm.  Plaintiffs in the related cases have filed motions for summary judgment that are *sub judice* and have been referred for report and recommendation to Magistrate Judge Lehrburger.  (Alpha Dkt. ## 30, 38; Dominion Dkt. ## 34, 45.)

referred to as causing a "death spiral" in a public company.  The effect, moreover, is augmented by cooperation among noteholders and by short selling activity.  While we do not have direct knowledge that such practices occurred here, our suspicions remain.  The Notes are in effect "toxic" financing instruments, designed not to provide risk capital to a company in need of it to grow and fulfill its business plan, but to obtain outsize returns for the noteholders at little or no risk.

21.     Until roughly a year and a quarter ago, ShiftPixy's stock continued to trade near its initial (2017) offer price; its 52-week high in the quarter ending May 31, 2018 was $4.62 per share.  Since April of this year, however, its share price has declined: it traded as low as $0.26 today.  There are no apparent reasons for the collapse of ShiftPixy's shares' market price.  As indicated above, ShiftPixy has reported consistently good operating results; its business plan and business model are working well; its client and worksite employee base have grown enormously in a short time.  All in all, ShiftPixy is a company that should be highly attractive to technology-oriented investors in its sector.  Instead, with the precipitous decline of its share price, ShiftPixy has come under increasing pressure to recapitalize or otherwise rid itself of these "toxic" noteholders.

**The Decision to Force a Default; Consequences of Default.**

22.     In June 2019, under increasing pressure because of the collapse of its share price and the consequent difficulty in locating additional investment to continue to fulfill its business plan, ShiftPixy decided to force a default under the Notes.  It ceased to honor conversion demands issued by noteholders, and it later ceased making repayments of principal and payment of interest.  As it applies to this case, however, and to the present motion, is whether the default in any way can justify MEFI in obtaining the relief it seeks here.

10

23.     However, and at the outset, I wish to make it crystal clear that while ShiftPixy does not contest its default under the terms of the 2018 Notes held by MEFI, it does vigorously contest the amount that MEFI claims to be due by reason of that default.  Under the Notes, default triggers acceleration of principal and interest as well as certain penalties.  The Notes call for the calculation of what is termed a "Mandatory Redemption Amount."  ShiftPixy and MEFI are at different ends of the spectrum with respect to that amount; and their respective views cannot be reconciled.  The disparity is roughly two-fold, with ShiftPixy calculating the Mandatory Redemption Amount at roughly $1 million, and MEFI calculating it at roughly $2 million.  And MEFI's claim for this amount is based on principal balances due of only roughly $700,000.

24.     In short, ShiftPixy contends that MEFI's calculation of what is termed the "Mandatory Redemption Amount" is flatly wrong and has no support in the text of the Notes.  ShiftPixy concedes that principal and interest calculated in accordance with the Notes is due MEFI, but MEFI's calculation of that amount (the Mandatory Redemption Amount) is off by a factor of two.

***ShiftPixy's Present Operations and its Search for Solutions to this Litigation.***

25.     As is clear from the discussion above of the company and its present financial condition, it should be said that ShiftPixy is operating in the normal course of its business.  Except for its obligations to its senior noteholders, it is meeting other obligations from cash flow.  And while normal operations continue, ShiftPixy is also actively exploring transactions through which it will be able to repay all noteholders, including plaintiff MEFI here.  I cannot be more forthright in describing these steps at this time, as possible deals are inchoate and still in flux of course have not been, and cannot be, publicly disclosed at this time.  I can

say, however, that the company and its investment bankers are actively exploring several potential transactions, and we are hopeful of being able to complete at least one before the calendar year-end.

### MEFI's Arguments for Restraint of ShiftPixy's Assets and Appointment of Itself as Receiver.

26.     I am advised and understand that in moving for this relief, MEFI advances one essential rationale.  It argues (in its memorandum in support of the motion and in the Sason Declaration) that upon default under the Notes the relevant instruments – the 2018 Notes themselves and the security agreement given in connection with the Notes – by their express terms confer on it (a) the absolute right to have the Court enter a prohibitory injunction against ShiftPixy to enforce a prohibition against use of its assets when in default under the Notes, and (b) the absolute right to have the Court appoint it receiver of those assets, and to dispose of them as it sees fit in receivership.  In this same connection, I understand that while not set forth in its memorandum as a rationale, it also argues (in the Sason moving declaration) that two other alleged non-payment defaults – the adoption by the board of ShiftPixy of a stock buyback program and the repurchase by ShiftPixy of stock from a founder (Steven Holmes) – equally justify the relief sought.

27.     I do not address the first purported rationale, as it is a legal question that will be dealt with by counsel in ShiftPixy's brief in opposition.  I do address the latter two alleged defaults because, as I will show, MEFI is wrong:  neither of these actions violates or is a default under the Notes.

### The Stock Buy-Back Program.

28.     Specifically, MEFI complains that the adoption by ShiftPixy of a stock buy-back program "is in direct violation of the negative covenants contained in Section 7(d) of

the [Notes] and constitutes an Event of Default thereunder pursuant to Section 8(a)(ii)" thereof. (Sason Decl. ¶ 23.) The facts show otherwise.

29.     By SEC Forms 8-K dated July 12, 2019, and June 11, 2019, ShiftPixy advised that its board of directors had approved adoption of a stock buyback program to retire stock to its treasury, a program designed in part to increase share price. (*See* ShiftPixy SEC Form 8-K, dated July 12, 2019, filed in the Alpha Action as Ex. C to the Absher Declaration, and June 11, 2019, Ex. D, Alpha Action Dkt. # 7, Attachments 4 and 5.) The stock buyback program was in part intended to address a notice of potential delisting that ShiftPixy received from the NASDAQ stock exchange because its stock price had fallen to below $1.00. It was ShiftPixy's expectation that the buyback program would be beneficial for ShiftPixy and its stockholders, and would benefit the noteholders as well since they would be able again to convert debt to common stock at a favorable conversion price.

30.     *ShiftPixy has not implemented the stock buyback program*. In furtherance of the board's approval of the program, it has taken only preliminary steps. For example, it opened a brokerage account which would be used for the sale by security holders, and purchase by ShiftPixy, of tendered stock. It established requisite accounting arrangements so that buybacks are classified on its books correctly. It advised its accountants about the buyback program and by its 8-K filings disclosed the adoption of the program to the investing public and of its contemplation that the program would be put into effect over an initial period of 18 (eighteen) months, extendible at the discretion of ShiftPixy's board.

31.     However, and fatal to MEFI's motion in this regard, *ShiftPixy has not purchased a single share of its common stock* on *the open market under the program*. ShiftPixy ceased to take any further steps concerning the program in or about September 2019, and has

13

suspended all actions related to the program.  The Company will not commence share repurchases under the program until it has determined that to do so would be in the interest of all concerned parties and will not violate interest-holders rights.

   32. Even more significantly, ShiftPixy disclosed to the Court these same facts regarding the buy-back program in connection with plaintiff's motion for a preliminary injunction in the Dominion Action.  The Court accepted the proffer to continue the suspension of the program, and implemented it by ordering ShiftPixy (and its counsel) to provide thirty (30) days' notice to the Court and plaintiff there of any intention to do so.  ShiftPixy and I of course stand by that commitment and order.  (And MEFI could easily have determined this by reading the Court's orders, a step one would assume they would have taken before filing the present motion.)

   33. MEFI is an investment fund with no apparent experience in operating (or even liquidating) public companies, much less public companies in ShiftPixy's industry.  Yet in the guise of seeking to enforce its contract rights, it seeks to assume the role of receiver of ShiftPixy's assets and operations, to shut down those operations, and to assemble and liquidate ShiftPixy's assets to satisfy ShiftPixy's indebtedness to it.  The order it seeks would cause ShiftPixy to default on trade debt; salary, wage and benefits obligations for over 67 employees; payment of rent; and all other operating obligations.  It would render it impossible for ShiftPixy to continue in business.  It would deprive ShiftPixy's corporate employees of their work and drive many onto the unemployment rolls.  Moreover, the relief MEFI seeks would destroy the public market for ShiftPixy's securities and injure scores of public holders of ShiftPixy's stock.  The remedies sought by MEFI are extreme and dangerous; its application should be denied.

*Balancing the Equities.*

34.     I am advised that the relief sought by MEFI is equitable relief, and in that connection the court may balance the equities, by considering harm done to the parties by granting or denying relief.  I respectfully submit that the harm that granting MEFI's motion would cause far outweighs any harm that MEFI could suffer.  This is discussed further throughout this declaration where I specify who the stakeholders are and how the restraints MEFI wishes to impose would affect them.

*The "Sale" of Stock by Steven Holmes.*

35.     MEFI complains that the sale by Steven Holmes of 558,132 shares of his ShiftPixy stock, as reported in an SEC Form 4  (Statement of Changes in Beneficial Ownership), filed July 19, 2019, is an event of default under the June 2018 Note and December 2018 Note. (Sason Decl. ¶¶ 24-25.)  (Holmes is a founder of ShiftPixy.)  MEFI contends that this sale was a violation of a lock-up agreement that Holmes executed in connection with delivery to MEFI of the June 2018 Note in which he covenanted that he would not sell shares of ShiftPixy common stock while ShiftPixy's indebtedness to senior noteholders was outstanding.  Since the lock-up agreement was delivered in connection with the sale of the June 2018 Note, MEFI says that it qualifies as a "Transaction Document," and since the note provides that a breach of any Transaction Document would constitute a default under Section 8(a)(ii) of the note, this sale of some of Holmes's shares (as a founder, Holmes owns shares in addition to these sale shares) is a breach by ShiftPixy of the June 2018 Note and December 2018 Note.

36.     But Section 8(a)(ii) encompasses only "Transaction Documents" ("the Company shall fail to observe or perform any other covenant, obligation, or agreement contained in the Notes . . . or in any Transaction Document.")  Of course, the lock-up agreement itself is

not a covenant or obligation contained in any note.  Only if the lock-up agreement is a

Transaction Document will its breach qualify as a default under the Notes.  MEFI is incorrect in

asserting that the Holmes lock-up agreement is a "Transaction Document."  "Transaction

Document(s)" is a defined term in section 3(b) of the parties' Securities Purchase Agreement.  (A

copy of the Securities Purchase Agreement is Attachment 4 hereto.)  The agreement states,

> "Transaction Documents" means, collectively, this Agreement, the
> Notes, the Warrants, the Amendment Agreements (as defined
> below), the Registration Rights Agreement, the Irrevocable
> Transfer Agent Instructions (as defined below) and each of the
> other agreements and instruments entered into or delivered by any
> of the parties hereto in connection with the transactions
> contemplated hereby and thereby."

37.     The lock-up agreement is not a Transaction Document as it is defined.

Accordingly, there could be no breach of that agreement that triggered a default under the Notes.

38.     The facts are simple.  The company had loaned Steve Holmes money, I

believe it was $325k, for which he signed a promissory note.  I understand that our auditors,

Marcum LLP, felt that we should recharacterize the transaction as a stock sale (from Holmes to

ShiftPixy) rather than loaning money to a director and officer.  We followed their advice.  This

was not part of any formal stock buyback process that we were considering.

39.     Of course, the purpose of the prohibition against ShiftPixy purchasing

ShiftPixy's own stock was to guard against dissipation of assets that would otherwise have been

available to repay the noteholders.  In the case of the Holmes' sale, while the note was forgiven

by the exchange of stock, the amount forgiven was immaterial, MEFI cannot say that if Holmes

had repaid the promissory note those proceeds would have been used to pay noteholders, and to

the extent that ShiftPixy bought back the shares as treasury stock, that increased the value of the

stock to all interest-holders, including the noteholders.

16

40.     I would like to add a postscript.  As I pointed out above in paragraphs 16-17, in the aggregate, MEFI and the other senior noteholders (two of which have not sued ShiftPixy) benefitted enormously from their investments with ShiftPixy.  But in addition, these noteholders converted and sold 8.3 million shares of ShiftPixy's common stock over the last 10 months (actually in the seven months ending May 31, 2019), representing roughly 68% of the public float when ShiftPixy ceased honoring conversions).  And although MEFI would have the Court appoint it receiver, it today owns only 10.2% of the total notes outstanding.

***Conclusion.***

41.     For all these reasons, and for those which my counsel has articulated in our brief in opposition, I respectfully submit that the Court should deny in all respects MEFI's motion.

Executed the 13th day of November 2019, at Irvine, California.

                            /s/ Scott W. Absher
                            SCOTT W. ABSHER